O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| HERBERT BLAKE, | ) | CASE NO. CV 08-05715 AHS (RZ) |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE |
| MATTHEW KRAMER, Warden, | ) | |
| Respondent. | ) | |

Pursuant to 28 U.S.C. § 636 and General Order 05-07 of the United States District Court for the Central District of California, the undersigned submits this Report and Recommendation to the Honorable Alicemarie H. Stotler, United States District Judge.

Petitioner Herbert Blake was released on parole in 2008. By the present Petition for Writ of Habeas Corpus, he asserts that he should have been paroled two years earlier, in 2006, and therefore that he should be eligible for release from parole in 2011, not 2013, under California Penal Code section 3000.1(b). The undersigned agrees, and recommends that the Court grant the Petition for Writ of Habeas Corpus.

///

///

///

///

# I.

## BACKGROUND

In June 1987, Petitioner Herbert Blake was convicted of second degree murder and sentenced to fifteen years to life in state prison. (Petition, Exhs., at 219.) The Los Angeles County Superior Court found the following circumstances surrounding Petitioner's conviction:

> The record reflects that on February 19, 1986, the Petitioner shot and killed Rodney Franklin in the chest with a handgun. Prior to this offense, the victim had severely beaten the Petitioner's brother with a baseball bat, in a drug-related dispute. The Petitioner and Larry Jenkins had confronted the victim and took him at gunpoint to a courtyard. While the victim was being led away, another person fired a gun twice into the air and the Petitioner shot and killed the victim.

(*Id.*, at 289.)

Petitioner became eligible for parole in 1994, but was denied parole by the Parole Board eight times before his 2006 hearing. (*Id.*, at 201-29.) At the 2006 hearing, after Petitioner had spent nearly 20 years in prison, Petitioner offered the following concerning his commitment offense:

> . . . I was there the night before when the victim hit my brother with the baseball bat. [¶] And I had taken my brother to the hospital. And he lived in the victim's drug house. So it wasn't where the victim lived. The victim lived somewhere else. I went back the next day . . . to retrieve my brother's I.D. The hospital admissions said that he – they gave him emergency

> treatment, but they said they couldn't treat him any further
> unless he had identification.  So I went back to the drug house,
> not really expecting to see the victim, because he didn't live
> there.  And when I got there, he was there.

(*Id.*, at 16-17.)  The Board asked Petitioner why he was armed when he returned to the drug house.  (*Id.*, at 19.)  Petitioner responded:

> Well, from the night before, I felt that they were pretty
> violent in that area.  [¶]  However, it was never my intent to hurt
> anybody.  In hindsight, I can see that it was ill-advised to go
> somewhere with a loaded gun, because all kinds of things can
> happen.  But in my mind, all I was doing was carrying it for my
> own protection.

(*Id.*, at 19-20.)  Petitioner accepted "full responsibility for taking the victim's life."  (*Id.*, at 21.)  Petitioner was 38 years old at the time of the offense.  (*Id.*, at 32.)

The Board noted that Petitioner's criminal history consisted of a number of juvenile and adult arrests and convictions for crimes such as assault with a deadly weapon, driving under the influence, and carrying a concealed weapon.  (*Id.*, at 28-30.)  In sum, Petitioner had suffered a total of eight prior convictions; four out of the eight were for driving under the influence and none of the eight was a felony conviction.  (*Id.*, at 31.)

Petitioner's behavior while in prison was exemplary.  Over his 20 years in prison, Petitioner had remained entirely discipline-free.  (*Id.*, at 38.)  He was an active, and in one case even a founding, member in multiple AA and NA groups; he was a leader in the therapy groups.  (*Id.*, at 38-41, 44.)  Petitioner also actively pursued educational and job training while incarcerated.  (*Id.*, at 40-44.)

Petitioner's most recent psychiatric evaluation, completed in 2003, found that Petitioner had changed his lifestyle and therefore that his potential for violence was "essentially nil" and less than that of the average citizen. (*Id.*, at 44-45, 236-38.) Petitioner received support letters and job and housing offers from many sources; he had plans to work as an x-ray technician and to live in a sober living home if paroled. (*Id.*, at 46-64.)

Petitioner noted that he used to deny responsibility for the crime, blaming drugs or other circumstances. (*Id.*, at 73-74.) After the District Attorney's office voiced its opposition to Petitioner's parole based in part on Petitioner's alleged failure to accept responsibility for the crime, Petitioner responded:

> It was indicated that I'm not as remorseful as some would like. But I feel that when you're remorseful, you don't – you don't say it, you express your remorse. And that's what I do. I've said it before that I had taken a lot. I've taken a lot from people and I'm trying to give back what I can . . . . This incident was a tragic incident, but I want to – I want to assure you, . . . that I am personally responsible for the death of Rodney Franklin. There's no other way I can say it. I have no reservations. I'm not making any concessions and saying that if it hadn't have been for this or if it hadn't have been for that – I shot and killed this victim and I'm remorseful for it. All I have to give back is my life and the things that I can do to try to help someone else so that this doesn't happen again. . . . It was a senseless act and I've been, for the last 19 years, I've been trying to make sense of it so that I can explain it. But I can't. It's just something that I'll always be sorry for and I'll never be able to take back.

(*Id.*, at 99-101.)

At the conclusion of the hearing, the Board granted Petitioner parole, finding that Petitioner was "suitable for parole and that [he] would not pose an unreasonable risk for danger to society [*sic*] if released." (*Id*., at 103.)   The Board further found that Petitioner admitted his responsibility for the death and that there were two reasonable, plausible versions of the facts – Petitioner's and the prosecutor's – and that based on these, the trial court found that the murder was of the second degree. (*Id*., at 104-05.)   In short, the Board noted that while the nature of crime could have been more than what was minimally necessary for a second degree murder conviction, it also reasonably could have happened according to Petitioner's version of the facts. (*Id*.)

The Board noted that Petitioner's prior criminal history was not totally free from violence, but was not especially violent, either, and did not result in any felony convictions. (*Id*., at 105-06.) The Board found that Petitioner had acceptable parole plans and that Petitioner demonstrated remorse for the crime. (*Id*., at 107-09.) Echoing Petitioner's positive psychiatric evaluation, the Board noted that Petitioner had a "reduced probability of recidivism" because of his maturation. (*Id*., at 107.)

What the Board found compelling were Petitioner's ability to remain entirely disciplinary free throughout his lengthy incarceration and his active engagement in education and therapy programs. (*Id*., at 106-07.) As the Board put it, Petitioner had "done everything that can be asked of you." (*Id*., at 106.) The parole decision became final on October 20, 2006. (*Id*., at 115.)

On November 17, 2006, Governor Arnold Schwarzenegger reversed the parole grant. (*Id*., at 118-21.) The Governor noted many of Petitioner's accomplishments, but found that they were outweighed by negative factors, including: (1) the murder was grave because it may have been premeditated; (2) Petitioner exhibited callousness by not assisting the victim after he shot him; (3) Petitioner was not sufficiently remorseful because he made inconsistent statements about why he shot the victim; (4) Petitioner had been inconsistent about whether his use of drugs and/or alcohol played a role in the crime. (*Id*., at 120-21.)

On March 23, 2007, Petitioner challenged the Governor's reversal in a habeas petition filed in the Los Angeles County Superior Court. (*Id.*, at 284.) Petitioner argued that his continued detention violated his federal constitutional right to due process because there was no evidence to support the Governor's decision. (*Id.*, at 285.) Specifically, Petitioner argued that the factors relied upon by the Governor had no relation to whether Petitioner presented a current risk to society if paroled. (*Id.*, at 286.)

Relying on *In re Rosenkrantz*, 29 Cal. 4th 616, 128 Cal. Rptr. 2d 104 (2002), the Superior Court upheld the Governor's decision:

> The Governor is constitutionally authorized to make "an independent decision" as to parole suitability. *Rosenkrantz*, *supra*, 29 Cal. 4th 616, 670. Only a "modicum of evidence" is required. *Id.*, at 677. Here, the Governor reversed the Board's decision to grant petitioner parole because he concluded that the Petitioner's crime was especially grave because there was evidence in the record that the Petitioner had engaged in some level of premeditation. The Governor noted that in the preliminary examination transcript, the investigating officer testified that one of the Petitioner's crime partners had indicated that the Petitioner went to the scene specifically to find the person who had beaten his brother with a bat the day before. The Petitioner returned to the area with a weapon the next day with others who knew of this plan. The Governor also noted that according to the preliminary examination transcript, the court found that it could reasonably be inferred that the crime partners arrived with their activities already mapped out.

The Governor can properly rely upon the circumstances of the crime in deciding that petitioner is not presently suitable

for parole.  That is particularly true where the facts of the committing offense are more than would be minimally necessary to convict him of the offense for which he is confined. *Rosenkrantz, supra*, 29 Cal. 4th 616, 683.  The record demonstrates that that was the case with regard to the Petitioner's conviction second degree murder.

(Petition, Exhs., at 289-90.)

Petitioner raised his due process challenge in the California Court of Appeal. (*Id.*, at 292.)  On December 12, 2007, the Appellate Court denied relief because "[t]he record submitted reflects some evidence to support the challenged decision.  (*In re Rosenkrantz* (2002) 29 Cal. 4th 616, 664-65.)."  (Petition, Exhs., at 300.)  On June 11, 2008, the California Supreme Court denied relief without further analysis.  (*Id.*, at 458.)

## II.

## ANALYSIS

Petitioner argues here that the Governor's reversal of the 2006 parole grant violated his due process rights because there was no evidence that he continued to be a danger to society at that time. (Petition, at 7-22.)  Specifically, Petitioner contends that the gravity of the commitment offense, which was the sole ground upon which the Governor's reversal was upheld by the state courts, was a constitutionally insufficient ground, under California law, for denying him parole.  (*See id.*, at 18-20.)

Prior to this year, it was clear under Ninth Circuit authority that California law created a constitutionally protected liberty interest in parole under California Penal Code section 3041.  *See e.g. Irons v. Carey*, 505 F.3d 846, 850-51 (9th Cir. 2007); *Sass v. Calif. Bd. of Prison Terms*, 461 F.3d 1123, 1127 (9th Cir. 2006); *Biggs v. Terhune*, 334 F.3d 910, 914-15 (9th Cir. 2003).  In May 2010, however, an *en banc* panel of the Ninth Circuit issued *Hayward v. Marshall*, 603 F.3d 546 (9th Cir. 2010) (*en banc*), in which the court

expressly declined to reach the issue of whether California law confers a constitutionally protected liberty interest in parole to state lifetime prisoners and instructed other courts in the Ninth Circuit also to avoid that issue. *Id.*, 603 F.3d at 562 ("[T]he doctrine of constitutional avoidance counsels not deciding whether the California parole scheme establishes a predicate for imposing it as a matter of federal constitutional law. . . . We therefore do not decide whether a right arises in California under the United States Constitution to parole . . .") (footnote omitted).  Just weeks later, however, a three-judge panel of the Ninth Circuit found that the court in *Hayward* did reach this jurisdictional question and in fact decided that California does create a liberty interest in parole such that California prisoners are entitled to due process in parole considerations. *See Pearson v. Muntz*, 606 F.3d 606, 609 (9th Cir. 2010) ("What the State fails to recognize . . . is that state-created rights may give rise to liberty interests that may be enforced as a matter of federal law . . . [as] was the case in *Hayward*.  By holding that a federal habeas court may review the reasonableness of the state court's application of the California "some evidence" rule, *Hayward* necessarily held that compliance with the state requirement is mandated by federal law, specifically the Due Process Clause.").

Whether or not there is a liberty interest in California parole historically has been the central question for courts reviewing claims such as Petitioner's under the Antiterrorism and Effective Death Penalty Act ("AEDPA").  Under the AEDPA and federal habeas review in general, federal courts may review only federal questions; therefore, whether or not a petitioner has a federally cognizable liberty interest in parole must be considered before any other issue may be addressed.  The *Pearson* court acknowledged as much in its 2010 opinion. *Pearson*, 606 F.3d at 608-09 ("A federal court may, of course, review a habeas petition only on the ground that the petitioner 'is in custody in violation of the Constitution or laws or treaties of the United States.' 28 U.S.C. § 2254(a).").

If a California prisoner does have a liberty interest in parole, then federal law remains clear: "the Supreme Court [has] clearly established that a parole board's decision

1  deprives a prisoner of due process with respect to this interest if the board's decision is not

2  supported by 'some evidence in the record.'"  *Irons*, 505 F.3d at 851 (quoting *Sass*, 461

3  F.3d at 1128-29 (in turn citing *Superintendent v. Hill*, 472 U.S. 445, 457, 105 S.Ct. 2768,

4  86 L.Ed.2d 356 (1985))).

5          Based on the *Hayward* court's explicit instruction to future courts to set aside

6  this issue, it is not at all clear how to interpret the later ruling in *Pearson* – that *Hayward*

7  found that California law does create a liberty interest in parole.  What is certainly clear,

8  however, is the *Hayward* court's articulation of the standard of review for California parole

9  decisions:

10

11               Since the "some evidence" requirement applies without

12               regard to whether the United States Constitution requires it, we

13               in this case, and courts in this circuit facing the same issue in the

14               future, need only decide whether the California judicial decision

15               approving the governor's decision rejecting parole was an

16               "unreasonable application" of the California "some evidence"

17               requirement, or was "based on an unreasonable determination of

18               the facts in light of the evidence."

19

20  *Hayward*, 603 F.3d at 562-63 (footnote omitted).

21          Under California law, a parole determination is to be based on whether "the

22  prisoner will pose an unreasonable risk of danger to society if released from prison."  *See*

23  15 CAL. CODE REGS. § 2402(a).  Therefore, there must be "some evidence" in the record

24  of the prisoner's present or future dangerousness in order to deny parole.  In 2008, the

25  California Supreme Court clarified this standard:

26

27               [A] parole release decision authorizes the Board (and the

28               Governor) to identify and weigh only the factors relevant to

1    predicting whether the inmate will be able to live in society
2    without committing additional antisocial acts.  These factors are
3    designed to guide an assessment of the inmate's threat to
4    society, *if released*, and hence could not logically relate to
5    anything but the threat *currently* posed by the inmate.

6

7    *In re Lawrence*, 44 Cal. 4th 1181, 1205-06, 82 Cal. Rptr. 3d 169 (2008) (quotations

8    omitted) (emphasis in original).[1]  The court continued:

9

10    [U]nder the statute and governing regulations, the circumstances
11    of the commitment offense (or any of the other factors related to
12    unsuitability) establish unsuitability if, and only if, those
13    circumstances are probative to the determination that a prisoner
14    remains a danger to the public.  It is not the existence or
15    nonexistence of suitability or unsuitability factors that forms the
16    crux of the parole decision; the significant circumstance is how
17    those factors interrelate to support a conclusion of current
18    dangerousness to the public.

19

20    *Id.*, 44 Cal. 4th at 1212.

21          Therefore, this Court must examine, pursuant to California law as explicated

22    by the California Supreme Court, "whether 'some evidence' supports the conclusion that

23    the inmate is unsuitable for parole because he or she currently is dangerous."  *Id.*,

24

25

26    ────────────────

27          [1]  The Court must apply the *Lawrence* clarification even though many of the parole
      decisions in Petitioner's case pre-date the *Lawrence* opinion.  *See e.g. Hayward*, 603 F.3d 546
28    (applying *Lawrence* to analyze pre-*Lawrence* state decisions).

44 Cal. 4th at 1191; *see also In re Shaputis*, 44 Cal. 4th 1241, 1254, 82 Cal. Rptr. 3d 213 (2008); *Hayward*, 603 F.3d at 562-63.[2]

In Petitioner's case, the only factor relied upon by the state courts to support the Governor's parole reversal was the aggravated nature of Petitioner's commitment offense.  (*See* Petition, Exhs., at 289-90, 300, 458.)  The California Supreme Court in *Lawrence* explained the parameters for denying parole based solely on a prisoner's commitment offense:

> [T]he aggravated nature of the crime does not in and of itself provide some evidence of *current* dangerousness to the public unless the record also establishes that something in the prisoner's pre- or post-incarceration history, or his or her current demeanor and mental state, indicates that the implications regarding the prisoner's dangerousness that derive from his or her commission of the commitment offense remain probative to the statutory determination of a continuing threat to public safety.

*Lawrence*, 44 Cal. 4th at 1214 (emphasis in original); *see also Cooke v. Solis*, 606 F.3d 1206, 1216 (9th Cir. 2010) (granting habeas relief where no evidence, other than possibly evidence of the commitment offense, suggested that the petitioner remained a danger to society).

---

[2]  The state argues that *Hayward* sanctions nothing more than a procedural review, not a substantive review.  The state argues, in other words, that this Court may consider only *whether* the state courts applied a some evidence standard, not *how* the state courts applied the standard or the reasonableness of the application of the some evidence standard.  The Ninth Circuit did not so describe its holding in *Hayward* and the court explicitly rejected this argument in *Pearson*. *Pearson*, 606 F.3d at 609.

Here, the state courts did not offer any explanation of how Petitioner's 1986 offense related to his present dangerousness in 2006. Instead, they found that parole was not warranted based solely upon a finding that Petitioner's crime was more egregious than was minimally necessary for a second degree murder conviction. But in Petitioner's case, this distinction, by itself, does nothing to demonstrate Petitioner's potential for dangerousness 20 later, at the time of the parole decision.

In contrast, as noted above, Petitioner's behavior in prison for the entirety of his incarceration was stellar. As the Board put it, he did *everything* that could have been asked of him. He was a leader in therapy and work at the prison. He received no disciplinary violations in more than 20 years in prison. He had solid parole plans and had mended relationships with his family. Petitioner's criminal history was minimal. And the prison psychiatrist found him to be a lower risk to public safety than an average citizen.

Under the governing authorities, it was an unreasonable application of the California "some evidence" standard to conclude that Petitioner continued to present a danger if released; alternatively such a decision was based on an unreasonable determination of the facts in light of the evidence. *Hayward*, 603 F.3d at 562-63; *Lawrence*, 44 Cal. 4th at 1214; *Cooke*, 606 F.3d at 1216; *see also Adams v. Schwartz*, 2008 WL 4224561, *13 (E.D. Cal. Sept. 12, 2008) (given the passage of time and the petitioner's behavior in prison, the petitioner's "extensive" but "not particularly violent" criminal history is not some evidence of present danger), *Report and Recommendation adopted in full by District Court at* 2008 WL 4601088 (E.D. Cal. Oct. 15, 2008); *Tash v. Curry*, 2008 WL 3984597, *12 (N.D. Cal. Aug. 27, 2008) (while murder was "terrible," it was not enough, by itself, to warrant parole denial given the petitioner's "rehabilitation, psychological stability, and remorse for the offense.").

In fact, even if the Court were to examine the commitment offense, doing so would not justify the Governor's reversal of the Parole Board. The Governor stated that Petitioner premeditated the murder, but as the Parole Board explained, the known facts of the crime could just as reasonably be reconciled with Petitioner's version of the crime.

This type of divergence is an improper basis on which to deny parole; it does not demonstrate that Petitioner was refusing to accept responsibility for his crime or to show remorse for his crime. *See e.g. Murr v. Marshall*, 673 F. Supp. 2d 1028, 1056 (C.D. Cal. 2009) (where the petitioner's version of crime is not shown to be incorrect or implausible and the petitioner accepts responsibility for the crime, the Board may not deny parole based on the petitioner's lack of insight or failure to take responsibility); *In re Palermo*, 171 Cal. App. 4th 1096, 1111-1112, 90 Cal. Rptr. 3d 101 (2009) (there is a difference between denying responsibility and insisting on a plausible version of facts different from the prosecutor's). The same is true for Petitioner's earlier refusals to accept responsibility, which he acknowledged in 2006 and distanced himself from. As Petitioner put it, it made more sense for him to show his remorse through his good works than to come to the Board with only words and no actions.

## III.

## REMEDY

While this habeas case has been proceeding, on September 19, 2008, Petitioner again was granted parole by the Parole Board. (Respondent's 9/25/09 Status Report, at 1.) This time, the Governor did not reverse the parole grant. (*Id.*) On December 16, 2008, Petitioner was released on parole from state prison. (*Id.*; Petitioner's 9/25/09 Status Report, at 2.) The Court therefore must consider the proper remedy for the current grant of habeas relief, given that Petitioner has been released.

Under California Penal Code section 3000.1, a prisoner convicted after 1983 of second degree murder is subject to lifetime parole. CAL. PENAL CODE § 3000.1(a). Section 3000.1 provides further:

> Notwithstanding any other provision of law, when any
> person referred to in subdivision (a) has been released on parole
> from the state prison, and has been on parole continuously for

1   . . . five years in the case of any person imprisoned for second
2   degree murder, since release from confinement, the board shall,
3   within 30 days, discharge that person from parole, unless the
4   board, for good cause, determines that the person will be
5   retained on parole.

6

7   CAL. PENAL CODE § 3000.1(b).

8   Petitioner was released from parole in 2008; therefore, his current five-year
9   presumptive parole discharge date would be in 2013. However, Petitioner should have
10  been released on parole in 2006. Therefore, his five-year presumptive parole discharge
11  date should be occurring at least as early as 2011.

12  Habeas courts have leeway to fashion equitable remedies. *Burnett v. Lampert*,
13  432 F.3d 996, 999 (9th Cir. 2005). Applying this standard, the Court should order the
14  Parole Board to calculate a new five-year parole discharge date pursuant to section
15  3000.1(b) using what should have been Petitioner's 2006 release date. If the new five-year
16  date has not yet passed, then proceedings under section 3000.1(b) should commence when
17  appropriate, given the recalculated parole date. If the new five-year date already has
18  passed, then the Board should proceed immediately under section 3000.1(b) to consider
19  discharging Petitioner from lifetime parole.

20

21  **IV.**

22  **RECOMMENDATION**

23  For the foregoing reasons, the undersigned recommends that the District Court
24  issue an Order (1) accepting the findings in this Report; (2) directing that judgment be
25  entered granting the Petition; and (3) ordering (i) a grant of parole to Petitioner in
26  accordance with the June 22, 2006 decision finding him suitable for parole; (ii) the
27  calculation by the Parole Board of a release date based on the 2006 grant of parole; (iii) the
28  calculation by the Parole Board (because Petitioner already has been released on parole)

of the end to the five-year period of mandatory parole supervision, per California Penal Code section 3000.1(b), based on the 2006 parole grant-date.

DATED:   July 21, 2010

_____
RALPH ZAREFSKY
UNITED STATES MAGISTRATE JUDGE